The Farley Vs Alcoa The Farley & The Alcoa Fultons Wisconsin The Farley & The Alcoa   Merck vs. Apotex May it please the court. The evidence in the record in this case establishes that there's two and only two forms of memetazone furate that can be in Apotex's antiproto. The anhydrous and the patented monohydrate. No other finding was made and no other finding was possible on this record. When there's only two forms... Was that finding actually made? There was no, when I say no other finding was made, there was no finding... There was no finding made that there were only two. ...other than conversion from the anhydrous to the monohydrate at issue. There was a lot of talk about whether there were other forms, but there was no ruling by the judge one way or the other on this issue. The judge did not accept the evidence... Did the judge actually write down and say there are only two forms, I find, as a matter of fact? No, but the judge's opinion, the whole opinion is only talking about was there a conversion from the anhydrous to the monohydrate. It sounds like he probably assumed that was so. Right. But there was no finding. There was not expressed finding that said that there were no other forms at issue. The point for my premise here is that there's no evidence to support any other finding. Wait, but there's testimony that there existed 13 possible forms. Not all of them were known and written down and had names associated with them, but there is testimony that there were 13 forms. There was one statement at the end of their infringement rebuttal case that said in sharing documents there are 13 forms. There is no evidence, and I'll make sure I can make this clear. There's no evidence that any forms other than the anhydrous and the monohydrate could be an apotexis and a product. There's absolutely no evidence tying any of those forms to something that could be in the product. But it's not their burden to show that one of those forms could be in the product. It's your burden to show that the anhydrate converts to the monohydrate that is claimed, right? So why does it matter that there's no evidence that shows that one of those forms is in this product? We established through evidence of their technical people, their 30B6 witness, and our validity expert that they introduced themselves that the only two forms of memetazone that could be in the product- No, their expert kept saying two known forms, i.e. forms with names. And you all said, well, the only two forms that he kept saying, the only two known forms. That's my recollection of the testimony. Am I misremembering it? But I thought there was this whole little colloquy back and forth about him correcting you that it's the known form. I'm not sure. The only- Or correcting whoever took it up. The only- the two known forms is from their technical people. In other words, at our brief, the blue brief, pages 13 to 16, we outlined the five witnesses that testified that the only thing that would be in the product or that they would know in the product would be the anhydrous and the monohydrate. We started- we quoted at page 14 the extensive testimony that was given on the record by Dr. Trout, who was our validity expert, that they called. And his testimony nailed down that there's only two forms that could be in there and a product. Their 30B6 witness, Ms. Kovacs, who testified on behalf of Apotex, said- agreed that Apotex was aware of only two forms of memetazone that could be in their product. The three Apotex technical witnesses, Jang, their director of analytical operations, Hugh, the director of product development- Wait, Dr. Trout, am I reading from Dr. Trout? Let's look at page A1361 of the record. This is Dr. Trout's testimony. Question by Mr. Davis. How many forms of memetazone, furoate- I'm going to just butcher all these weird chemical words, so just please bear with me. Are you aware of? Answer. Oh, so there are two known forms. There's the anhydrate and the monohydrate. And during the deposition, Apotex gave me some information that it indicated possible forms, such as another anhydrate form and a solvate. I believe a benzyl alcohol solvate. I would consider those possible forms, but not known forms. The two known forms are anhydrate and monohydrate that we've been discussing. So why- that testimony doesn't seem anywhere near as clear as you're trying to make it seem. You're trying to make it seem like there are only two possible forms. And this is your witness, Dr. Trout, right? He's saying that he's aware of other possible forms, but they're just not known forms. I find that not really to support exactly what you said. The distinction is, could they be in Apotex's and the product? Is this because of the XRPD testing? In other words, the three peaks requirement, in your view, doesn't make sense if there are only two forms? Is that the context of this discussion? Yes. Our position is where the known universe of potential crystalline components in a sample are known. One unique peak is sufficient to identify- There are only two. There's only two here. But even if there were six, as in the hypothetical that Dr. Cockrobb advanced to the district court, if they're all known, and one peak is unique to one of those components and to no others, the presence of that peak establishes the presence of that component in the dictionary. These aren't pure samples. These are things mixed up with a bunch of other crap. Who knows what might be driving one peak? That's the whole problem. It's a reliability thing. It's noise. I'm an EE, not a chemical person, so these little blips aren't always clear to me. But how do you know that it's not an impurity of some sort, or not one of the additives that could be driving that one peak? I mean, that's the basis behind the 1940s article that said use three peaks and test it all with the chemicals, because three gave you a sense of reliability. And isn't it possible that with just one peak, it could be attributed to something other than the presence of a particular anhydrate or monohydrate, even if there are only two possible options? Not when you look at the range where the two peaks are unique and there's no overlap. There's a problem at the higher two theta value ranges in the XRPD testing where there's overlap, there's noise, there's interference. But if you look between the range between 5 and 12 degrees at the low end range, if you look at the chart from Apotex's document that's at the blue brief at page 18 and it's reproduced again in our yellow brief at page 34, the two peaks that are critical here are the 7.8 peak for the monohydrate and the 9.3 peak for the anhydrous, because they're unique to each of those because when it's in a sample that has only those two components, the 7.8 is unique to the monohydrate because the anhydrous cannot generate a 7.8 peak, and the 9.3 peak... But how do you know that none of the other 13 forms couldn't generate a 7.8 peak? Because there's no evidence in the record that gives any information to this court or that gave any information to the district court about how those components, what their XRPD characteristics were, the conditions under which they form, how they could be in the product. But there's testimony at 1062 that there are 13 polymorphs, hydrates, solvates, you know, there are 13 different things that this could be. The statement from Dr. Threlfall, which is at the bottom of 1062, says, in shearing documents, there are 13 polymorphs. That's the extent of his testimony. There's nothing in that testimony... Well, I've got to ask you to step back a moment because I'm not understanding this discussion. You're doing what is so common here is you're arguing the science to us as a lawyer. What testimony do we have from your expert witness that three peaks weren't required because there were only two versions of this hydrate? The only evidence of record is there's two things that could be in Apotex's product. This is really not a matter of science. This is a matter of deductive reasoning. Your answer is there isn't any testimony saying you don't need three peaks because there are only two forms of the hydrate. There's testimony that says one unique peak is sufficient when you know the combination. It's pure. There was testimony that when your stuff is all mixed up and lots of other things in it, then it's a little more problematic. The testimony... My take is that the district court judge heard both of these and the district court judge said I'm going to listen to all this and I'm going to decide that in these circumstances, I'm going to require three peaks to satisfy me that I know that we've got them on hydrate here because the stuff we can't talk about, the formulation of the product and the cover of the stuff that's wrapped around it, how you get it out. And so the judge said, yeah, perhaps in some circumstances, one peak would be enough, but not for me in the facts of this case. So I'm going to say I'm going to go along with the people that said that there's a convention out there that says if you really want to be certain, get three peaks. That's exactly the error the district court made. Was there testimony from an expert put in by you that three peaks aren't required because there are only two forms? The best expert testimony was put in by them, by Dr. Cockroft. Did their experts say that? Their expert testimony... Did their experts say, and I want to be clear about this, that three peak testing is not required because there are only two forms? Their expert did not say that, but his expert... Their expert did not say that, right? I mean, Dr. Massager said that you can establish the presence of the monohydrate from the 7.8 peak alone. Yes, but he didn't say we don't need three peaks because there are only two forms of the hydrate, right? He didn't say that expressly. I mean, this is all very interesting lawyer argument. I don't understand why the district court has to make findings about this when there isn't any explicit testimony to this effect. It seems to me you're asking an awful lot of the district court to address things that you didn't bother putting expert testimony in about. In terms of proving that the district court's three peak standard, which was the sole basis for non-infringement, was clearly erroneous. I'm focusing the court's attention on the expert testimony of their side. I'm not up here re-arguing that my expert was more credible. You should have believed him. I'm saying look at Dr. Cockcroft... But you're making a scientific argument that wasn't made by the experts and you're criticizing the district court for not addressing it and it seems to me that that's not entirely fair. I'm saying that the district court misunderstood the significance of the three peak standard. That Dr. Cockcroft's testimony, in a sense, disproves itself. By itself, it shows that it's not... It disproves itself. The three bases that Dr. Cockcroft had for his three peak standard was the Hanawalt Search Index, which wasn't involved with deciding if one component in a known universe of possible components was sufficient to satisfy a peak. But again, that hinges on the notion that there are only two possibilities and they put into evidence, whether it's right or it's wrong, that there are actually 13 possibilities. They didn't put it into evidence. That's my point. The premise of this is that they had a statement that said sharing documents shows there's 13 forms. There's nothing to tie those 13 forms to being in the apothecary and a product because they didn't get that evidence into the record. The district court excluded the underlying documents. The statement by Dr. Threlfall was there's sharing documents showing that these are the 13 forms. They did not... So they used the underlying document, which is the hearsay objection that he sustained, but they got in testimony that there exist 13 alternatives. So it's not a universe that it's either this one or it's that one. It is a universe of those two within the and a product because the only evidence of record is that the only two things that were known that could possibly be in the and a product, not anywhere in the world under extreme conditions. Where is that testimony? The only two things that could be in this and a product? Because I read to you your expert's testimony, which acknowledged the existence of other possible things but distinguished based on known things. The quoted testimony from our expert on page 14 of our blue brief, which is from the site on the next page. It's record 1327 to 1329. It says, and this is Apotex Axine, Dr. Threl. Right at the bottom of page 14, it says, okay, so your opinion regarding the 7.8... Hold on, let me get with you. You said age 1327, is that correct? That's correct. I'm actually quoting from our... We put this in its entirety in the blue brief on page 14. Right, you got the question that's posed at the bottom of page 14. Your blue brief hinges on the premise that there are only two possible forms. Well, no, it says. It hinges on the top of the next page. It hinges on the conditions in the sample, the formulation conditions that there are only two forms. So the only two forms that could be in their product, and the only thing this is... They did not get the evidence into the record that shows that any of those other 11 forms, because two of them are the anhydrous and the monohydrate. Any of those 11 forms could possibly exist under the conditions of this formulation. Could it possibly show a 7.8 peak? There's absolutely no evidence of the record. So it's a matter of the evidence that Dr. Threl holds one statement that sharing documents say that there are 13 forms does not counteract the five witnesses that all say the only two known forms to Apotex. I mean, there are three technical people. It's their witnesses, their formulation person, their director of operations. They all say the only thing that Apotex knew about were the two forms, and that's the only thing... Those were the people that would have known what would be in Apotex's product. So if you... To get to the point where you would have to examine the 13 forms, you would have to reverse the district court's ruling that excluded those documents from the record, and you would have to remand to the district court for findings on whether those 11 other forms could possibly exist in this product, because the district court's ruling was, I'm excluding that evidence because they made no attempt to get it into the record. They make an argument now that we're erasing this for the first time. But it's your burden to show infringement, right? So you would expect that you would have testimony saying that their three-peak requirement was wrong and unsustainable. And you don't have any testimony about that, except one expert said that one peak should be enough. Dr. Matsinger said that his expert opinion was that the 7.8 peak and the 11.6 peaks that were unique to the monohydrate relative to the anhydrous were sufficient to show the presence of monohydrate in the samples. That is our evidence. On the side of the scale, that would be our evidence. If we had won a jury verdict, there's no jury here, but if it was substantial evidence. I'm saying their evidence, the only thing that they have to counteract the evidence, is saying that there's these 11 other forms that exist. I'm saying this record does not contain any information that could give you an indication of how any of those 11 forms could possibly be in the ANDA product. They have tried to return... Maybe saying, well, yeah, you're right. Maybe in an ordinary circumstance, one peak might be enough. If you had a relatively pure substance, where I was testing something that was clean, I was testing something that hadn't been shook up and beat around whatever, the judge said, this may be a little different circumstance. Did the judge... It's unclear if the judge was aware of the fact that the Apotex product had, you know, very, very little of the magic stuff in it, and there were other things in there as well. Right, but the testimony that... And the gold standard, if you will, test for whether or not you have the monohydrate present is if you have three peaks. You're not arguing that the three-peak methodology would be thrown out under doubt? I'm arguing the three-peak methodology does not apply when the universe of known... You're not contesting the validity and the legitimacy of the three-peak methodology as a general proposition. I am. It's been around for a long time. No, it's not. Not in the circumstances of this case. The three-peak methodology... That was my point. The judge is saying, well, maybe in the circumstance of this case, he's going to require it because he can't be sure. He can't be sure what those two peaks show for certain that the monohydrate's present. It's actually clear error in the context of this case because the point is when you know the universe of known substances that are in there, if there's one unique peak, that's enough. The three-peak standard was, in a sense, manufactured for this case because we were talking about a range of information where there were only two unique peaks to the monohydrate. And so Cockcroft's testimony was focused on saying there's not the third peak. And by focusing on a lack of a third peak, he was able to avoid having to confront the fact that 7.8 peak that was in the samples came only from the monohydrate because there was nothing else in there that could generate that 7.8 peak. Okay. Thank you, Mr. Stanley. You're over your time. We'll give you two minutes for rebuttal. Ms. Mazzocchi, is that how you pronounce it? Mazzocchi, Your Honor. Thank you. May I proceed? Yes. Thank you. I'll address non-infringement first and invalidity second. Your Honor, I think it's very clear that on non-infringement, the district court weighed Merck's test and evidence and our test and evidence and found our test results and analysis were more consistent and credible than Merck's. That's not reversible error here. But I'd like to move you to something we didn't cover on Mr. Stanley's opening, which is the Raman testing. My understanding is that that is a separate way, separate and unique and distinctly different from the XRPD testing. And nonetheless, the district court seems to have improperly conflated the two in his opinion. In fact, on page 820 and 821, he seems to conclude that the reason that the Raman testing is not adequate to establish infringement is because there were less than three peaks found, as with Dr. Messinger's XRPD findings, because this doesn't identify three peaks. Well, the three peaks is not relevant at all to the Raman testing, as I understand it. Let me break your question down. If you actually look at what Judge Sheridan cited in that part of the opinion, he cites back to Dr. Threlfall's testimony, where what Dr. Threlfall said is, I've reviewed the Raman spectra, compared them to the monohydrate reference standards, and they don't match. But that's not what he found. I'm determining whether his fact findings are clearly erroneous, and his fact findings are clearly stated, and they're clearly erroneous. Well, I disagree with that, actually, because I think that when you look at it So you think, wait, just to make sure I clearly understand you, you think that it would be proper to rule that there's no infringement under the Raman spectroscopy, I probably said that wrong, because there were less than three peaks found, because an absence of three overlapping peaks. I mean, the Raman testing produces something that is not at all like the SRPD, as I understand it, and the three peak problem, i.e., the Hanawalt requirement of three identical peaks, is not something that would be imported into Raman. Isn't that true? We agree that the Hanawalt index was created to be specific to PXRD. But I think that when you look at the context of why the Raman came up, it came up because of this. They recognized they couldn't find all the monohydrate peaks that should have been there in the PXRD. Dr. Matsker then said, well, I'm going to try to see if I can come up with a second test that's going to perhaps give evidence that there's monohydrate in there, so that can be a confirmatory test to show that, really, there's nothing wrong with my PXRD test. So Dr. Matsker ran the Raman test and said he sees a lot of monohydrate in there. Our expert goes back and reviews these thousands upon thousands of PXRD patterns, I'm sorry, of Raman patterns, Raman spectra, and he says, no, these aren't matching up to your monohydrate reference standard. They're not matching, so that's not showing there's monohydrate there. Springarn? Springarn is your witness? Dr. Trolfo actually reviewed Dr. Matsker's Raman testing. Then we independently had Dr. Springarn perform Raman analysis. Sorry, just cut to the chase. If you look at the district court opinion, that's A-20-21. I think this is what was troubling Judge Moore, perhaps, is that the district court judge is saying at the bottom of page A-20, page 19 of the opinion, he's talking about the fact that Cockcroft and Truffall found the same problem as did with Matsker's XPD testing. There were less than three peaks. And therefore, the monohydrate cannot be identified. Right, but if you... You'll go too fast, I'm going to tell you that. So three peaks is irrelevant to that form of testing, correct? Yes or no? If you're trying to... Yes or no? Do you look for peaks when you do Raman spectrum? Oh, yes. There's peaks in the Raman spectrum, no question. But the three peak standard doesn't apply, right? The Hanawalt three peak index is not a Raman index. There's no... So what you're saying here is the district judge believed your witness but misdescribed his testimony by referring to three peaks. Right. I think that what... Is that correct? Yes. Yeah, I think that what the district court... Yes or no? I mean, why are you so difficult? No, because I just want to be clear that I think the district court understood that there were problems with the peaks in the Raman spectrum not matching up. Just let me go to one other place in the opinion. Go to the next page at 820.21 in the paragraph right above section 6 conclusion. The court finds that the Raman was relied on as little weight because it does not identify three peaks. Now, is that a problem or not? Would you expect it to identify three peaks? I would actually expect it to identify multiple peaks because in a Raman spectrum you typically have 10, 20, 30 peaks that are showing up in a Raman spectrum. And the dispute between Dr. Matsker and Dr. Threlfall on how to interpret the Raman spectra, Dr. Matsker at one point was trying to create these Raman maps using just one peak to try to sort spectra into monohydrate versus anhydrate category. Dr. Threlfall said, that's absolutely wrong, you can't do that. Then Dr. Threlfall said, I went back and I looked at the whole pattern which has lots of peaks and they don't match your reference standard. So that's a separate reason why, Dr. Matsker, I think you're wrong. Then I think if we look at the next part of that sentence that you drew me to that says, and by the way, there's also a significant difference in test results between Dr. Springer and Dr. Matsker. Our expert then took the same sample that Dr. Matsker said he found all this monohydrate in, independently tested it and found no evidence of monohydrate. And the plaintiffs agree that his method of detection went as low as 1%. Just to get the balance, I think what may have been troubling, because Morin was for me, is whether or not the reference to three peaks when deciding that the Raman spectrology test was inadequate, whether that was somehow reversible error. And to me, I don't... What's he trying to say when he's talking about absence of three peaks? Yeah, and I think that what he's ultimately getting at, when you go back and you look at the testimony that he's actually citing, he is referring to Dr. Threlfall's criticism of Dr. Matsker creating the Raman map by focusing on just a single peak. And then Dr. Threlfall's testimony, he's citing to that location where Dr. Threlfall said, and the other problem I have with what Dr. Matsker did, is when you look at the entirety of the monohydrate reference standard and compare it to Matsker's Raman spectra, they don't match. So I don't think Matsker has used this Raman spectra to actually make the match to monohydrate either. Then I think the district court recognized that we had our own independent testing of Raman that conflicted with Dr. Matsker's results as well. So that's why the district court ultimately concluded that the Raman testing was not going to be, for lack of a better phrase, their background test. The three peaks referenced in this section of the opinion were actually relating to the XRPD findings, not to the Raman spectra analysis. Right. Am I right? Again... Why is he talking about three peaks when he's talking about the Raman test? Well, again, I think if you go back... He made a mistake, right? The judge made a mistake. He believed the testimony, but described it in a way that was inaccurate. Well, as we said in our brief, I think it was a bit of a loose approach, or loose language that he used, because when you look at the actual testimony that he is citing in the prior paragraph, he's citing back to Dr. Trollfall's testimony that criticized Dr. Matsker for creating the Raman map using a single peak, which he said was improper. And then Trollfall's testimony that said, when you look at the whole pattern and compare it to the reference standard, they don't match. So you would invoke Chief Judge Markey's famous statement that we review decisions, not opinions. Absolutely, Your Honor. On page, I think it's 43, of your red brief, you say there's a Form 2 antihydrate disclosed in the Chen article, which exhibits an XRPD peak at 7.8. That's one of your bases for saying that one peak wouldn't be enough, because there's actually another antihydrate with a peak at 7.8. Show me where that is. Exactly, sure. If we take a look at the Chen reference, and I believe it's in the appendix at page A, 2290. Yeah, I'm there. I'm at 2290. Yes, so on that page. Now on page 2290, I don't see any sort, the figure at least, is not an XRPD printout, which would show 7.8. It's an IR printout, so it must be a different page. Sorry, I apologize. 2288 is where there's the, and as well as 2287. Well, let's take them one at a time. 2288, that figure at the top is what you're referring to, and that peak, that first peak, which could be at 7.8 is what you're referring to? Yes. Because that's a monohydrate. Right, I'm sorry. So that can't be the Form 2 antihydrate. I apologize, your order is 2291. Oh, 2291, okay. This is the one that's got the variable temperature. Which one is it? Can we decide on the page we're looking at? Yes, 2291. Okay, so 2291, both pictures are pictures of monohydrates. They say so expressly under this. Yeah, and what they did is they. . . So how is that a Form 2 antihydrate with a peak at 7.8 when they're both expressly said to be monohydrates? Because if you read the text, what they were doing here is they started heating up the monohydrate to convert it into another crystal form. That's why the PXRD pattern is changing as they go up in temperature. You can see that, for example, if you look at position number 9 in the bottom, it's flat there. But then if you look, by the time you've gotten to the top, now there is a sharp peak there. Wait, they're starting with a monohydrate. And you're saying they convert it into an antihydrate and there's a peak at 7.8. Is therefore evidence that there exists an antihydrate with a peak at 7.8. Is that my understanding? Well, wait a minute. But let's look at the picture. The monohydrate, which is what they start with, has a peak at 7.8, right? Yes. Right. So we know a monohydrate has a peak at 7.8. That's what the pattern establishes, right? So we shouldn't be surprised to see a peak of 7.8 throughout all the temperature ranges. Well, that's actually our whole point, is that as they're driving off the water from the crystal, the 7.8 peak doesn't go away. But if you've taken the water out of the monohydrate crystal, it's not a monohydrate anymore. That's the whole definition of a monohydrate, is that you've got a one-to-one ratio of water to drug. How do you know you've driven all the water out? Can you say so? Because it says 45% humidity in the text. So how do you know that you've driven all the water out? Right. If you look at the text, they describe what's going on in this experiment. And they say that there was a kinetic barrier of conversion from Form II to Form I due to the crystal packing differences of these two forms. And then they say in the next paragraph, at the higher temperature and low water activity, the monohydrate became metastable and dehydrated, which resulted in the formation of Form II. Well, I often get dehydrated, but I don't generally think that means my body is this total absence of water. Are we to understand that when this says it became dehydrated, it ceased to have any particle of monohydrate remaining in it, which would have been the basis for showing the 7.8P? Yeah. What it means is that you've driven the water out of the crystal cell. The definition of a monohydrate is you've got a one-to-one ratio in a unit cell of water to drug. So, for example, there's other cases that this court has dealt with where you have a hemihydrate. That means you've got half the amount of water for every unit of drug in the unit crystal cell. You can have dihydrates, where you've got twice as much water. So, here, the claims are specifically directed to a monohydrate. So, yes, indeed, as you start to remove the water from that sample. Where is the evidence that this is an anhydrate? Because they say that it became dehydrated. So, that means it lost its water. Form II, where exactly does it say it became dehydrated and lost all its water? Sure. On page A2291, first full paragraph, where they're talking about the monohydrate in Form II, then the second sentence, at high temperature and low water activity. So, at low water activity, the monohydrate, it doesn't say it became an anhydrate, right? Well, it continues to refer to it at that point as the monohydrate became metastable and dehydrated. So, at low water activity, which doesn't mean an absence of water, and it says that it's still a monohydrate at that point. No, because it says dehydrated, which resulted in the formation of Form II. Then, if you look on the prior page, it defines what they mean by Form II. So, at the first full paragraph on page A2290, it says Form II is a metastable anhydrous form. So, they're recognizing that they've lost the water. It's no longer a monohydrate. And furthermore, Your Honor, as you rightly recognize, the record did show that not only were there these forms, but there were also 13 additional forms that had been identified. Our expert testified, and it was never challenged, that these other forms existed. Our expert explained that— their theory that there's one and only one possible crystalline form that could give rise to these 7.8 and 11.6 peaks, no expert of theirs ever said that. No expert of theirs ever got on the stand and said 7.8 is, in fact, unique to monohydrate. No expert got on the stand and said 11.6 is unique to monohydrate. But didn't they say that there's only two possible forms? No. None of their experts testified that in the Apitex product, there's only two possible forms. Our fact witnesses never testified in our product, there's only two possible forms that could exist. Nobody said that, and they've got no record citation for that. And, in fact, when you trace back through their briefs, all they keep citing to are statements by people that are very general that says, we're aware of two different forms, monohydrate and anhydrate. Nobody has ever testified that those are the only two possible universal things that could ever show up. Much less tie that into the XRPD testing three peak standard. Exactly. And, furthermore, the reason why their expert, Dr. Masker, who was the one testifying about this, didn't do that, is because I got him to admit on cross-examination, there were some Apitex samples he looked at that had new peaks that didn't match up to monohydrate or anhydrate. And I said, well, what's your explanation for why those are there? There was a peak at 10.5. He said, I don't know. I don't know what they are. So there clearly were things being generated in the Apitex samples, quite frankly, as a result of Dr. Masker's test method. And that's why the district court was well within his rights to say, I don't think Dr. Masker's results are credible, and he credited ours. Because when our experts tested it by PXRD, we found no evidence of monohydrate. When we tested it by Raman, we found no evidence of monohydrate. So consequently, we think the district court was fully correct in making the decision that our experts and our results were more consistent and credible than Dr. Masker's data. If I may, I'd like to briefly talk about invalidity just because I'm close to being. I think we're out of time. Okay. Thank you, Your Honor. You have two minutes, Mr. Stanley. Thank you, Your Honor. The simple point is that there's nothing in this record that reflects any other piece or any other forms of monohydrate that could be in the Apitex product. You're talking about the Chen paper. There's nobody in the record testified about the Chen paper. We have attorney argument here. We have fact-finding on appeal about what Chen shows. If you were going to make a finding that there's other forms there, you would have to remand to the district court to allow. Why does he have to make a finding that there are more forms? He didn't even argue that. He didn't have an expert come in and say that the three-peak requirement is irrelevant because there are only two forms. I mean, what's the district court supposed to do? I mean, all of this argument is not something that was placed before the district court in terms of the three-peak requirement. Why is he supposed to make a finding about it? He made a finding that the three-peak requirement is required to prove the presence, and that three-peak requirement is clearly erroneous. There are 36 witnesses. You're saying it's erroneous because you invented an argument after the fact as to why he needed to make a finding about there only being two forms, but you didn't bother to have an expert witness come in and testify that the three-peak requirement was not necessary because there are only two forms. We established through five witnesses that there were two forms, and that was a case that required them to come back. If you look at the Warner-Lambert case that this court decided, it says it takes more than just mere speculation for us to have the burden to disprove that anything else in the universe that could have created the 7.8 peak. That was Warner-Lambert v. Teva, and the issue in that case was a summary judgment, and they said it's not enough. You have to come forward with specific evidence that shows there's something else in there that could generate the 7.8 peak. They never brought that evidence to trial. They never introduced that evidence. They didn't even try and discover it. These documents that are referred to that were properly excluded by the district court, the channel paper that we're talking about here, which wasn't excluded, it says on the face that it only exists, it's a metastable product that only exists in negligible humidity and over 70 degrees Celsius. It couldn't possibly exist in the Apotex product. They cite to a notebook page that talks about a benzyl solvate form, and there's no benzyl alcohol in their product. There's no, these products cannot be in the, these forms cannot be in Apotex's products, and there's no evidence in the record that establishes that they could be. So it really isn't. Thank you, Mr. Stanley. I think we're out of time. I thank both counsel. The case is submitted. That concludes our session for today. All rise.